IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KIMBERLY MILOVAC and DOMINIK MILOVAC, Individually and as Parents & Next Friends of Leo S. Milovac, a Minor,<br><br>Plaintiffs,<br><br>v.<br><br>THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY,<br><br>Defendant. | 8:20CV457<br><br>MEMORANDUM<br>AND ORDER |

 Kimberly Milovac ("Kimberly") and Dominik Milovac ("Domink" and collectively, the "Milovacs") are the parents of Leo Milovac ("Leo"), a minor. They filed this lawsuit individually and on Leo's behalf (Filing No. 21) based on a head injury Leo allegedly sustained while attending day care at Children's Ark, a childcare center owned and operated by the Evangelical Lutheran Good Samaritan Society (the "Society"). Now before the Court is the Society's Motion for Summary Judgment (Filing No. 33), arguing the Milovacs have not provided sufficient evidence to make out the sole remaining claim based on res ipsa loquitur.[1] For the reasons stated below, the Society's motion is granted.

I.  BACKGROUND
 A.  **Leo's Head Injury**

 In September 2019, Leo was ten months old. He could crawl, was learning to "pull himself up" to standing, and could "shuffle" his feet while holding onto a sturdy object, but he could not yet walk on his own. For instance, on the day before the incident allegedly causing Leo's head injury, Dominik observed Leo grab one of their kitchen chairs, pull

---

[1] In their brief, the Milovacs concede their claims for parental emotional distress and bystander recovery. They also clarify that they did not bring an ordinary negligence claim and only "allege one cause of action for res ipsa loquitur, with no specifications of negligence."

himself up to standing, and then lose his balance. Leo struck his head on the chair, just above his right eyebrow, which caused him to cry and resulted in redness in that area.

On the morning of September 20, 2019, Kimberly brought Leo to Children's Ark for the day. Before dropping him off, Kimberly took a photo with Leo, which did not show any injuries to the left side of Leo's head. She also told someone at Children's Ark about Leo's incident the night before because he still had a "red mark on his eye."

Charlie Rae Leibel ("Leibel") was a full-time employee at Children's Ark and often took care of Leo in "infant room one," which had four infants per teacher and accommodated infants between six weeks and one year old. On September 20, 2019, Leo was primarily in Leibel's care. While at Children's Ark on that day, Leibel observed Leo crawl to a "bouncy seat" toy being used by another child. Leo attempted to pull himself up to standing by holding onto the bouncy seat, but he lost his balance and hit his head. Leibel observed the incident, comforted Leo, and believes that Leo cried for about 30 seconds afterwards. The bouncy-seat incident did not leave a red mark on Leo's head, so Leibel did not make a formal report of this issue. Leibel did not observe Leo involved in any other incident in which Leo hit his head, but she was aware that Leo had been "getting out of the ball pit on his own the last few days," and the ball pit was in close proximity to a rocking chair.

Around 4:30 pm, Kimberly returned to Children's Ark to pick up Leo and her other child. She left the building with her children, and when Kimberly was putting Leo into his car seat, she noticed a bump on the left side of his head. Kimberly went back into the building and approached employees of Children's Ark to ask about Leo's injury, and none of them knew about the bump on Leo's head or what caused it. The employees stated they would ask Leibel because she was Leo's primary care provider that day. At 4:49 pm, Kimberly called Leo's pediatrician, and a member of the staff told her to keep an eye on the bump and watch for signs of a concussion but did not seem to indicate he needed immediate medical attention.

2

A bit later that day, Liebel messaged Kimberly through a messaging application, letting her know about the bouncy-seat incident and stating she did not notice a bump on Leo's head after that. Liebel also mentioned that Leo had been getting out of the ball pit on his own and could have hit his head on a nearby rocking chair. She finally stated she was "sorry for no real answer as to what happened—he's moving so fast these days, but I'll keep thinking through." Liebel maintains she does not know how Leo injured his head.

That weekend, Kimberly did not notice Leo crying vigorously and in pain or discomfort. He ate and slept normally. But she did notice that the bump on Leo's head had turned "purplish," was growing larger, and was "squishy." Although the bump on Leo's head alarmed her, and she wondered if she was overreacting. Dominik was also concerned about the bump on Leo's head and felt Leo was "kind of quiet and just sitting there withdrawn from everything."

Unrelated to the bump on Leo's head, Kimberly took Dominik to the Mary Lanning Hospital emergency room on Saturday afternoon, and Dominik was admitted to the hospital for an infection. While visiting Dominik, Kimberly asked multiple hospital employees to look at the bump on Leo's head and was told to "keep an eye on it." On Sunday, Kimberly and Leo again visited Dominik, and Dominik observed the bump to be "very, very puffy and squishy." Kimberly continued to ask hospital personnel to look at the bump on Leo's head because it had grown and gotten darker; they advised her to go to the emergency room if she was concerned.

Later that Sunday evening, Kimberly took Leo to the emergency room, and Leo was seen by Amelia Govert, PA ("Govert"). Govert ordered a CT-scan of Leo's head, and based on those results, Govert decided it was necessary to fly Leo to Children's Hospital and Medical Center in Omaha, Nebraska ("Children's Hospital"). Govert explained that Leo had a hematoma but was not sure if it was in Leo's brain tissue. Leo arrived at Children's Hospital early on Monday, September 23, 2019. Leo was initially treated in the emergency room, then admitted for further testing. Children's Hospital medical staff

3

confirmed Leo sustained a "subcarinal hematoma" that did not go into brain tissue. The MRI scan and CT-scan also revealed Leo had a skull fracture. Leo did not need surgery and was released at approximately 4:45 pm that day.

Leo healed without complications and is "thriving." He attended follow-up visits with his pediatrician and at Children's Hospital in Omaha, Nebraska. At his follow-up visit at Children's Hospital on October 14, 2019, his doctors concluded he recovered well and did not need any additional medical care in relation to the skull fracture.

### B. Mental Suffering of Kimberly and Dominik

After receiving the news that Leo needed to be transferred to Omaha, Kimberly was upset, experienced nervousness, anxiety, and tears. Although Kimberly did not take any medication or formally seek counseling after Leo's injury, she did talk with a friend who happened to be a counselor at Hastings College. Following Leo's injury, Kimberly did take some time off work and worked part time.

Dominik also felt stress and emotions following Leo's injury. After hearing that Leo needed to be flown to Omaha, Dominik felt he "couldn't do anything to help" Leo or Kimberly because he was also in the hospital. He was unable to sleep while at the hospital and cried while waiting to hear of Leo's results. Dominik continued to suffer from stress for the next few months because of the "unknown," such as not knowing what happened to Leo. He even imagined "that somebody got pissed off and annoyed" at Leo and "tossed him somewhere." Dominik continues feeling stress because he, as a police officer, sees cases of child abuse and neglect and is "constantly being reminded" of "the memories of . . . not knowing" what happened to Leo. Dominik has not sought any mental-health counseling but believes he continues to experience stress and insomnia.

### C. Expert Opinions

Both parties present expert testimony as to Leo's head injury. Leo's treating pediatric neurosurgeon at Children's Hospital, Dr. Kim Manwaring ("Dr. Manwaring"), believes an event causing such an injury normally "would have been associated with

vigorous crying for several minutes." The Milovacs assert "Dr. Manwaring will testify that the need for medical services . . . were caused by the injuries Plaintiff Leo Milovac sustained on September 20, 2019, while under the sole care and custody of Defendant's childcare facility, Children's Ark." Dr. Manwaring notes the injury-causing event was "unwitnessed" and "unexplained," and does not provide an opinion as to how Leo sustained his injury.

The Society identified their own expert, Dr. Steven Krug ("Dr. Krug"), who agrees with Dr. Manwaring that the type of injury Leo sustained often results in "several minutes of vigorous crying after such a fall." He also notes "that head injuries of the type Leo suffered can happen when a child falls from a standing position, particularly if they fall on a hard surface." Dr. Krug further opines that "[f]alls happen with great frequency for toddlers first learning to stand and walk," and "[t]he most frequent cause of such an injury for children Leo's age relate to falls while ambulating or climbing." Dr. Krug concludes his report by stating, "It is my opinion that Leo's injury most likely occurred due to a fall that happened without any negligence by whomever was caring for him at the time."

## II. DISCUSSION
### A. Standard of Review

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if "it must inevitably be resolved and its resolution will determine the outcome of the case." *To v. U.S. Bancorp*, 651 F.3d 888, 892 (8th Cir. 2011). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, [the Court] do[es] not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Thomas v. Corwin*, 483 F.3d 516, 526 (8th Cir. 2007). Those "are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

The movant has the initial burden, which it can satisfy in "either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). The nonmoving party must then respond with specific facts supported by evidence to show the presence of a genuine issue for trial. *Id.*

### B. Nebraska Law

The parties agree Nebraska substantive law applies in this diversity case. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). If the Nebraska Supreme Court has "not decided a particular substantive legal issue of relevance, [the Court] must try to predict how [that] court would do so and decide the case accordingly." *Lindholm v. BMW of N. Am., LLC*, 862 F.3d 648, 651 (8th Cir. 2017).

### C. Res Ipsa Loquitur

The Society argues it is entitled to summary judgment on the Milovacs's negligence claim they bring under the res ipsa loquitur doctrine. Under Nebraska law when a negligence claim is based on res ipsa loquitur, "the examination of whether there is a genuine issue of material fact must be related solely to the issues under the required elements of the doctrine." *Darrah v. Bryan Mem'l Hosp.*, 571 N.W.2d 783, 786 (Neb. 1998).

> There are three elements that must be met for res ipsa loquitur to apply: (1) The occurrence must be one which would not, in the ordinary course of things, happen in the absence of negligence; (2) the instrumentality which produces the occurrence must be under the exclusive control and management of the alleged wrongdoer; and (3) there must be an absence of explanation by the alleged wrongdoer.

*McLaughlin Freight Lines, Inc. v. Gentrup*, 798 N.W.2d 386, 389 (Neb. 2011). If any one element is not met, the doctrine does not apply. *Id.*

A plaintiff is not required to eliminate "all other possible causes or inferences" of the injury, *Anderson v. Service Merchandise Co.*, 485 N.W.2d 170, 176 (Neb. 1992), but must provide "sufficient evidence from which reasonable persons could find that it is more likely than not that the three elements of res ipsa loquitur have been proved," *McLaughlin Freight Lines, Inc.*, 798 N.W.2d at 389. If the plaintiff has made such a showing, the doctrine is applicable and "allows an inference of a defendant's negligence to be submitted to the fact finder, where it may be accepted or rejected." *Id*. On the other hand, if "the doctrine of res ipsa loquitur is inapplicable as a matter of law and there is no material question of fact regarding actionable negligence, summary judgment is proper." *Darrah*, 571 N.W.2d at 786.

No Nebraska courts have addressed whether the res ipsa loquitur doctrine can apply to unexplained injuries suffered by children while in a daycare or nursery. Courts from other states analyzing the issue have recognized that the doctrine could apply, depending on the circumstances of the case. *Compare*, *Ward v. Forrester Day Care*, 547 So.2d 410 (Ala. 1989) (applying res ipsa loquitur where 11-week-old child suffered unexplained broken arm in day care); *Zimmer v. Celebrities, Inc.*, 615 P.2d 76, 78-79 (Colo. App. 1980) (applying res ipsa loquitur where 25-month-old child sustained a skull fracture while in day care); *Myers v. Moore*, 217 S.W.2d 291 (Mo. Ct. App. 1949) (applying the doctrine where five-week-old child sustained animal bites while in a nursery), *with Hawkeye Bank v. State*, 515 N.W.2d 348, 349 (Iowa 1994) (denying application of res ipsa loquitur where six-year old died from asphyxiation on playground); *Robinson v. BT II, Inc.*, 2015 IL App (1st) 143658-U, ¶¶ 3-7, 2015 WL 7137026 at *1 (deciding the doctrine did not apply when a three-year-old cut forehead requiring stiches while at daycare).

As to the first element of the doctrine, the Court must analyze the evidence to determine whether the occurrence—Leo's head injury—is one which would not ordinarily occur in the absence of negligence. *McLaughlin Freight Lines, Inc.*, 789 N.W.2d at 729-30. The Society presents evidence from its expert, Dr. Krug, that an injury like the one Leo sustained can occur in young children if they fall from a standing position. It is also

7

common knowledge that children learning to walk and who are able to pull themselves up to standing position may fall. *See*, *e.g.* *Welsch by Welsch v. Columbia Kinder Coll., Inc.*, 2017 IL App (5th) 160213-U, ¶ 26, 2017 WL 924487 at *5 ("It is incredible to argue in the instant case that it is common knowledge that young children do not on occasion trip and fall injuring themselves in the absence of negligence. On the contrary, it is common knowledge that a two-year-old may trip and fall simply because of lack of coordination skills."). The Milovacs do not dispute that such instances are normal for young children. Indeed, there are two occurrences in the record where Leo pulled himself up by grabbing onto furniture, fell or lost his balance, and bumped his head.

The Milovacs point to the severity of Leo's injury and Dr. Manwaring's opinion that an injury like Leo's would normally be "accompanied by vigorous crying for several minutes" as evidence that his injury could not have been caused by an ordinary fall, such as the one involving the bouncy seat, and was the result of some negligent act by Children's Ark. They generally argue that it is common knowledge that a healthy ten-month-old with limited mobility does not go to daycare unharmed and leave with a skull fracture absent negligence. But as the Society points out, Leo was very fortunate that his injuries were not necessarily "severe." He did not need to stay in the hospital, nor did he need subsequent medical care after his follow-up appointment. Furthermore, the Milovacs do not present any expert testimony to rebut Dr. Krug's assessment that such an injury could, and often does, result from a child falling onto a hard surface. *See*, *e.g.*, *Ward v. Mount Calvary Lutheran Church*, 873 P.2d 688, 693 (Az. Ct. App. 1994) (declining to apply the doctrine of res ipsa loquitur and explaining "no expert testimony by affidavit or otherwise was offered to establish that [the child's] injury could not have been caused by his fall in the grass while running").

Nor do the Milovacs present any facts to support a theory or create an issue of fact as to how Children's Ark acted negligently or what, if anything, at Children's Ark caused Leo's injury. They point to *Zimmer* as a similar case, in which a 25-month-old sustained a "severe skull fracture" at a bowling-alley nursery wherein there were exposed pipes in

the play area and only three adults to watch thirty-one children. *Zimmer*, 615 P.2d at 79. But in *Zimmer*, the Colorado court of appeals concluded the evidence of exposed pipes and "inadequate supervision . . . established a factual basis from which the jury could conclude that the injury more probably than not was a result of negligence." *Id*. Although *Zimmer* is not binding on this Court, it is worth noting that no similar facts, such as a possible lack of supervision or unsafe surroundings, exist here to create a such a factual question.

Under Nebraska law, res ipsa loquitur permits an inference of negligence but only if that "inference 'is probable and more plausible than any other explanation propounded.'" *Swierczek v. Lynch*, 466 N.W.2d 512, 517-18 (Neb. 1991) (quoting *Morgan v. Willis-Knighton Medical Center*, 456 So.2d 650, 655 (La. App. 1984)). The Milovacs have not shown sufficient facts to support a reasonable inference that it is more likely than not that Leo's injuries were caused by Children's Ark's negligence. The Society argued, and the Court agrees, the Milovacs have failed to meet their burden as to the first element of the res ipsa loquitur doctrine, and no inference of negligence is presumed.

Accordingly,

IT IS ORDERED:
1. Defendant the Evangelical Lutheran Good Samaritan Society's Motion for Summary Judgment (Filing No. 33) is granted.
2. This case is dismissed with prejudice.

Dated this 21st day of January 2022.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
Chief United States District Judge